**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Richard A. Ganim, Jr.,** | ) | **CASE NO. 1:07 CV 1497** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| **Columbia Casualty Company,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendant.** | ) | |

### Introduction

This matter is before the Court upon defendant's Motion for Summary Judgment (Doc. 16).  For the following reasons, the motion is GRANTED.

### Facts

Plaintiff, Richard A. Ganim, Jr., filed this Complaint against defendant, Columbia Casualty Company.  As an overview, the Complaint alleges the following.  Plaintiff is a registered representative of Legacy Financial Services, Inc., and is insured under a Policy of Insurance issued by defendant to Legacy.  In 2004, plaintiff was sued in the Cuyahoga County Common Pleas Court.  Plaintiff tendered the defense of the claim to Columbia which

1

thereafter accepted the defense. The case was subsequently dismissed without prejudice. In 2006, an arbitration proceeding was commenced against plaintiff and defendant declined to defend.

The parties submit the following facts.[1]

In January 2004, plaintiff entered into a Registered Representative Agreement with Legacy Financial Services which permitted him only to sell securities approved by Legacy. Plaintiff also entered into an agency agreement with Legacy Marketing Group in January 2004 in order to sell Legacy insurance products. Legacy required plaintiff to participate in an insurance plan maintained by Legacy which coverage was issued by defendant.

Defendant issued a Life Agent/Broker Dealer Solutions insurance, Policy No. 267825767, to Legacy for the period of January 1, 2004 to January 1, 2005. The policy provided coverage to Legacy and its contracted agents and registered representatives for certain specified activities as set forth therein only. Applicable coverage parts consist of the following.

---

[1] Plaintiff moves to strike the declaration of Andrew L. Margulis (Doc. 21). The motion is denied. "Generally, a district court should dispose of motions that affect the record on summary judgment before ruling on the parties' summary judgment motions." *Brainard v. American Skandia Life Assur.*, 432 F.3d 655 (6th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n. 5 (1986)). Plaintiff asserts that Margulis, defendant's attorney, lacks personal knowledge as to the attachments to his declaration and the attachments are inadmissible because they have not been authenticated by the person competent to do so. Margulis declares, however, that the exhibits attached to his declaration consist of pleadings, depositions and documents produced in discovery in this action. On this basis, the Court may consider them. *Brainard,* 432 F.3d at 667 ("[R]egardless of the contents of [the] declaration itself, a review of the attachments to that declaration reflects that it only contained properly authenticated discovery materials.")

The Insuring Agreement under Coverage Part A states:

The Insurer shall pay on behalf of the Insured all Loss which the Insureds shall become legally obligated to pay resulting from a Claim . . . for a Wrongful Act . . . solely in rendering or failing to render Professional Services as an Agent and/or General Agent or Registered Representative.

Coverage Part A defines professional services as follows:

5. **Professional services** means only the following services to the extent they are provided in the course and scope of the Insured's business as an Agent and/or General Agent or Registered Representative having the appropriate license in both the Client's resident state and the state in which the business is to be conducted:

    a. services as a notary public;

    b. sale, attempted sale or servicing of employee benefit plans, individual retirement plans and KEOGH retirement plans;

    c. Administration of Employee Benefit Plans;

    d. Sale, attempted sale or servicing of life insurance, accident and health insurance, managed care organization contracts, disability income insurance, fixed annuities, and 24 hour care coverage (as defined by statutory law);

    e. Sale, attempted sale or servicing of variable annuities, variable life insurance and mutual funds, which are registered with the Securities Exchange Commission (if required), through a Broker/Dealer that is a member of the National Association of Securities Dealers;

financial planning activities in conjunction with services described in paragraphs a thru e of this definition, whether or not a separate fee is charged;

    f. supervision, management and training of an Agent by a General Agent with respect to activities

3

>otherwise covered by this Coverage Part A.
>Provided, however, any such coverage shall not
>apply to any Claim alleging any employment
>practices of any kind.

The Insuring Agreement under Coverage Part B states:

>The Insurer shall pay on behalf of the Insured all Loss which the
>Insureds shall become legally obligated to pay resulting from a
>Claim . . . for a Wrongful Act . . . solely in rendering or failing to
>render Professional Services as a Registered Representative...

Coverage Part B defines professional services as follows:

3. **Professional Services** means only the following services arising out of the conduct of the Insured's business as a Registered Representative or Registered Investment Adviser:

>a. Investment Advisory Services;
>
>b. sale or attempted sale or servicing of securities
>(other than variable annuities, variable life
>insurance and mutual funds) approved by a
>Broker/Dealer (Legacy) named in item 2 of the Declarations
>and incidental advice in connection therewith;

financial planning activities in conjunction with services described in paragraphs a and b of this definition, whether or not a separate fee is charged;

>c. supervision, management and training of a
>Registered Representative by a registered principal
>with respect to activities otherwise covered by this Coverage Part B. Provided,
>however, any such coverage shall not apply to any Claim alleging any employment
>practices of any kind.

The term "Investment Advisory Services" is defined in the policy's General Terms and

Conditions section:

>**Investment Advisory Services** means advisory services provided
>by a Registered Investment Adviser pursuant to the Investment
>Advisers Act of 1940 with respect to securities approved by a
>Broker/Dealer (Legacy) named in Item 2 of the Declarations, provided that,

4

>prior to providing such services, the Registered Investment
>Adviser gave written notice of such services to the Broker/Dealer
>named in Item 2 of the Declarations and received written approval
>from such Broker/Dealer to conduct such transactions. However,
>Investment Advisory Services does not include the sale or
>attempted sale or servicing of securities.

Plaintiff acknowledged at deposition that as a Registered Representative he was only permitted to sell or offer for sale those items on a list approved by Legacy.

Additionally, Coverage Part B contains the following exclusions from coverage:

...the Insurer shall not be liable to pay any Loss in connection with any Claim:

>6. based upon, directly or indirectly arising out of, or in any
>way involving any actual or alleged sale, attempted sale,
>recommendation, advice or counsel regarding products or
>services not approved by a Broker/Dealer specified in Item
>2 of the Declarations.

>8. based upon, directly or indirectly arising out of, or in any way involving the use of
>or investment in, any security that is not registered with the Security and Exchange
>Commission.

On October 4, 2004, Vincent Santalucia filed a lawsuit against plaintiff in the Cuyahoga County Court of Common Pleas alleging that Santalucia co-founded Carlyle Financial Group LLC with plaintiff herein and that Santalucia invested his personal assets in Carlyle. It further alleged that plaintiff herein was acting within the course and scope of his position as financial advisor to Santalucia, and that plaintiff herein advised Santalucia "in all aspects of his financial planning, including stock and mutual funds purchases, IRA investments, retirement planning, etc."

Plaintiff provided notice of the state court action to defendant and requested a defense. By letter of January 13, 2005, defendant, through attorney Ella Goodyear, informed plaintiff that it would provide a defense for plaintiff subject to a reservation of rights to disclaim

5

defense and indemnity coverage. The letter advised plaintiff that since Carlyle was not an approved product, no coverage would be available in connection with losses resulting from the alleged Carlyle investments. As the state court complaint, however, contained allegations regarding investments other than Carlyle, defendant agreed to defend, and did defend, plaintiff in that action which was then voluntarily dismissed without prejudice on September 7, 2005.

In January 2006, Santalucia made an arbitration claim against plaintiff, Questar Capital Corporation and Legacy Financial Services before the National Association of Security Dealers (NASD). Plaintiff again submitted the claim to defendant. By letter of February 6, 2006, defendant, through Ms. Goodyear, informed plaintiff that neither defense nor indemnity coverage was afforded to him under the policy. The letter outlined the nature of the arbitration claim:

> The Statement of the Claim in this matter states that in or about 1998, you 'turned to your long-time friend and loyal customer Vincent Santalucia to raise money [you] needed to start [you] own financial company.' ¶7. Specifically, the claimant asserts that in 2002, you 'told Santalucia that he had the opportunity to invest in the new venture from the 'ground up.' '¶8. According to the Statement of the Claim, you emphatically recommended that Santalucia invest in your 'new financial services business.' ¶9 You, according to the Statement of the Claim, would retain control over the business but Santalucia, upon your recommendation, 'ultimately provided all the financing.' *Id.* Allegedly, from the inception of the 'financial boutique,' and/or the 'Carlyle Entities,' in mid-2002, you controlled absolutely every aspect of the management of the business. ¶10.
>
> The Statement of the Claim further states that in 2004, following your becoming a registered representative with [Legacy], you began diverting assets from the Carlyle Entities for the benefit of a 'new venture tentatively named Bayshore Lending.' ¶13. By the late Spring of 2004, 'Santalucia finally realized he had been taken advantage of [and] began the process of terminating his relationship with you and the Carlyle Entities. ¶14.

The letter provided the basis for the determination. First, defendant referred to Coverage Part

6

B's definition of professional services which includes investment advisory services with respect to securities approved by Legacy and the sale or attempted sale or servicing of securities approved by Legacy. The letter stated, "Upon information and belief, neither Carlyle Entities nor Bayshore Lending is a security, and certainly not a 'security' approved by Legacy Financial Services, Inc." Thus, there was no coverage. Second, defendant pointed to Exclusion 6 which excludes coverage for claims based on the sale, attempted sale, etc. of products or services not approved by Legacy. Third, defendant pointed to Exclusion 8 which excludes coverage for claims involving securities not registered with the Securities and Exchange Commission. Again, because Carlyle was not approved by Legacy and was not a security, these exclusions were found to apply.

Plaintiff thereafter filed this Complaint. Four claims are set forth. Count One alleges breach of contract in refusing to provide a defense. Count Two alleges bad faith as there was no reasonable justification to withhold the defense. Count Three alleges that defendant's refusal to accept the defense of the arbitration proceeding after previously defending the substantially similar civil proceeding constitutes a breach of defendant's good faith obligation owed to plaintiff. Count Four alleges that defendant failed to act in good faith in applying the deductible set forth in the policy to the claims asserted against Legacy in the arbitration.

This matter is now before the Court upon defendant's Motion for Summary Judgment.

**Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*,

8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his response], by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is genuine issue for trial. If he does not respond, summary judgment, if appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985). However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

### **Discussion**

Defendant argues that it was not required to defend plaintiff in the arbitration.[2]  Plaintiff asserts that there was a duty to defend.  For the following reasons, the Court agrees with defendant.

Under Ohio law, questions regarding the extent of coverage provided by an insurance policy are determined by an examination of the relevant insurance documents under the familiar rules of construction and interpretation applicable to contracts generally. *Gomolka v. State Auto. Mut. Ins. Co.*, 70 Ohio St.2d 166 (1982) Where the language is clear and unambiguous, courts must enforce the contract as written and give the words their plain and ordinary meaning. *Cincinnati Indem. Co. v. Martin*, 85 Ohio St.3d 604 (1999).  Under Ohio law governing an insurer's promise to defend against groundless, false, or fraudulent allegations, the test of the duty of an insurance company to defend an action against an insured, is the scope of the allegations of the complaint in the action against the insured. *Motorists Mutual Ins. Co. v. Trainor*, 33 Ohio St.2d 41 (1973) The duty to defend arises only

---

[2] As Santalucia's claim was denied in the arbitration, the only issue herein is the duty to defend.

9

when the allegations potentially state a claim that is within the policy's coverage. If the duty to defend arises only when the allegations potentially state a claim that is within the policy's coverage, it follows that there is no duty to defend when there is no possibility that the insurance company will have to pay damages. *Illinois Union Ins. Co. v. Shefchuk*, 108 Fed.Appx. 294 (6th Cir. 2004). *See also Wedge Prods., Inc. v. Hartford Equity Sales Co.*, 31 Ohio St.3d 65 (1987) (An insurer has no duty to defend where there is no possibility of coverage.)

Defendant demonstrates that the allegations of the arbitration were not within the scope of the policy's coverage and there was no possibility of coverage for the claim.

Defendant points to the Insuring Agreement Under Coverage Part A[3], set forth above, which requires that the claim involve the rendering or failing to render of professional services. Defendant contends that the allegations of the arbitration do not involve any of the professional services identified under Coverage Part A. Rather, the arbitration makes allegations only about plaintiff's conduct with respect to Santalucia's investment in Carlyle, plaintiff's own financial services business. As a result, plaintiff's actions as alleged in the arbitration are not professional services and are not within the scope of Coverage Part A.

Likewise, defendant argues, the Insuring Agreement of Coverage Part B requires that in order to be covered, plaintiff's loss must result from the rendering or failing to render professional services as defined therein. These services include "investment advisory services" which means "advisory services . . . with respect to securities approved by

---

[3] As discussed above, however, defendant denied coverage on the basis of Coverage Part B and the exclusions to coverage.

10

[Legacy]" and the sale or servicing of securities approved by Legacy.  Thus, defendant asserts, both of the relevant categories of professional services require the involvement of securities approved by Legacy.  On the other hand, defendant points out, if the security that forms the basis of the wrongful acts involved in the claim was not approved by Legacy, then any conduct relating to such unapproved security cannot be professional services, and cannot be within the scope of coverage of the policy.

Defendant points to the following allegations contained in the arbitration claim to support its contention that the only investment that forms the basis of that claim was Santalucia's alleged investment in the Carlyle entities:

1. This arbitration addresses the unsuitable and inappropriate solicitation of a customer's retirement savings by his long-term investment adviser, to invest in that investment adviser's *own financial services business* [identified as Carlyle.]...

7. In 1998, Ganim first expressed to his friend and customer Vince Santalucia his longtime personal dream: he wanted to form his own comprehensive 'one stop' financial services business. . . . Eventually, he turned to his longtime and loyal customer, Vincent Santalucia, to raise the
money Ganim needed to start his own financial services company...

8. In 2002 Ganim was ready to launch his new financial services business and he told Santalucia that he had the opportunity to invest in the new venture from the 'ground floor.'...

9. Ganim emphatically recommended that Santalucia invest in Ganim's new financial services business. . . . Ganim called his new financial services business the 'Carlyle Financial Group, LLC' which originally included Carlyle Mortgage Services, LLC and later included Lincoln Land
Title Agency, LLC, Carlyle American Tax Services, and Lincoln Land Funding, LLC. ...

10. ... After exhausting Santalucia's personal investment accounts, Ganim recommended that his customer tap his qualified retirement accounts for additional capital needed by the 'Carlyle' businesses." ...

11. Relying upon Ganim's advice, encouragement and pressure, Santalucia continued to pour money into the Carlyle Entities even after his original assets had been depleted. ...

According to defendant, these allegations make clear that the claim was based solely on Santalucia's investment in Carlyle entities and plaintiff's alleged wrongful conduct in convincing Stantalucia to invest therein. Defendant points out that no other investments are mentioned in the arbitration, whether they be securities, annuities, life insurance products, or mutual funds.

Given that Carlyle is the only investment mentioned in the arbitration, defendant contends, in order for the alleged conduct to be covered under Part B, Carlyle must have been a "security approved by Legacy," and it was not.  Plaintiff, in fact, testified at deposition that Carlyle was not a security under applicable regulatory guidelines and regulations, and that it was not "approved" by Legacy. (pltf. depo. 71-73) Defendant further points to plaintiff's statements made in his motion to dismiss the arbitration claim:

> This arbitration does not involve any investment or financial advice, the sale of securities, or any other actions that [plaintiff] took as a NASD associated member.
>
> \*\*\*
>
> Beginning on page 5 of the Statement of Claim, Santalucia finally alleges the actions that Ganim purportedly improperly took, and for which Santalucia is attempting to recover. Specifically, he alleges that, as his broker, Ganim "recommended" he "invest" in the "Carlyle Entities" . . . All of the losses for which Santalucia is seeking to recover stem from these supposedly recommended investments that he made in the Carlyle Entities during that time period.

(Margulis Decl. Ex. K)[4]

---

[4] Defendant also points to the affidavit of Ann Marie Foley, who was employed by Legacy until July 2007 and avers that Carlyle was not a security, and for that reason was not approved by Legacy.  (Foley aff.)  Plaintiff asserts that this affidavit goes beyond the four corners of the arbitration claim and, thus, cannot be considered.  For the reasons set forth herein, the Court need not have the benefit

As a prerequisite for rendering professional services required a security approved by Legacy, there can be no coverage in the absence of such.

With regard to the bad faith claim, defendant asserts that the claim fails in that defendant had reasonable justification to deny coverage for the arbitration on the basis that its allegations fell outside the scope of the Insuring Agreement.

Plaintiff asserts that the Court must consider whether the unproven allegations in the arbitration claim triggered the duty to defend, and that the Court must find that the allegations of misrepresentations, omissions, and breach of duty in connection with the sale of securities clearly triggered this duty.

Plaintiff contends that although defendant denied coverage on the basis that plaintiff was selling a product unapproved by Legacy, and that he was selling products that were unregistered securities, the arbitration claim did not contain any allegation that Carlyle was not approved or that it was an unregistered security.  On this basis, plaintiff contends that defendant's denial is based upon facts that are not within the four corners of the arbitration claim.  Instead, plaintiff asserts, the arbitration claim alleges that it is founded upon "misrepresentations and omissions in connection with the purchase and sale of securities," and that plaintiff's conduct was a breach of his duty to make "only recommendations which are suitable for a customer based upon his/her age, experience, risk tolerance and financial objective." The arbitration claim concludes that plaintiff breached his duty of absolute trust and loyalty to Santalucia by failing to provide securities, brokerage and financial counseling

---

of this affidavit to reach its conclusion regarding whether defendant properly refused to defend.

services consistent with Santalucia's investment, objectives, and express authorizations.

Plaintiff points out that the Contract of Insurance obligated defendant to defend plaintiff against allegations of wrongful conduct whether false, groundless, or fraudulent. Plaintiff contends that whether the allegations asserted in the arbitration claim are false, groundless or fraudulent is immaterial to the question of whether defendant had a duty to defend.  As such, plaintiff argues, there are triable issues of fact as to whether these allegations constitute financial planning activities in conjunction with the sale, attempted sale or servicing of any of the investment vehicles listed in paragraph 5 of Coverage Part A, and whether these allegations fall within Coverage Part B's definition of investment advisory services, the sale or attempted sale or servicing of securities, and any financial planning activities in conjunction with these type of services.  For the following reasons, this Court disagrees.

While it is true that defendant was obligated under the policy to defend against false, groundless, or fraudulent claims, there is no duty to defend where the claims do not fall within the scope of coverage, i.e., where there is no possibility of coverage, there is no duty to defend.  Here, defendant has demonstrated that the alleged wrongful conduct was not within the scope of coverage and plaintiff has failed to demonstrate otherwise by showing that any of the conduct was within the scope of the policy.  There was no coverage under Part A because the alleged wrongful conduct did not involve any of the professional services listed therein (notary public; sale of employee benefit plans, IRAs and KEOGH retirement plans; administration of employee benefit plans; sale of life insurance, accident and health insurance, managed care contracts, disability income insurance, fixed annuities and 24 hour

care coverage; sale of registered variable annuities and variable life insurance and mutual funds). Plaintiff does not point to an allegation in the arbitration claim showing one of these services. There was no coverage under Part B because there was no allegation in the arbitration claim that involved investment advisory services with respect to securities approved by Legacy or the sale or servicing of securities approved by Legacy. Defendant knew that Carlyle, the only investment involved in the arbitration claim, was not an approved security. Exclusions 6 and 8 also applied for the same reason. Plaintiff argues that because the arbitration claim contains allegations regarding the purchase and sale of securities but does not specifically allege that the securities were not approved by Legacy, defendant must defend the claim inasmuch as it agreed to defend false, groundless, or fraudulent claims. However, the arbitration claim could not possibly have made such an allegation because the claimant would not have known whether a security was approved by Legacy. The arbitration claim specifically referenced Carlyle (and no other investments) and defendant knew it was not a security and not approved by it.[5] Thus, there was no potential for coverage. If the claim had not identified specific securities but had alleged that such were sold or serviced, there could have been a possibility of coverage.[6]

Plaintiff asserts that defendant breached its duty to defend as evidenced by the lack of discussion in the declination letter of coverage under Part A. But, as defendant has demonstrated, Carlyle does not fit into any of the categories of professional services described in that Part and plaintiff does not show otherwise.

---

[5]     As discussed above, plaintiff also knew that Carlyle was not an approved product.

[6]     Defendant points out that this was the case in the state court action.

Additionally, plaintiff asserts that the declination letter contains an incomplete discussion of all the elements set forth in the arbitration claim and the letter "devotes fourteen lines of text to an arbitration claim that is thirteen pages long, with twenty-eight separately numbered paragraphs and countless allegations of wrongdoing." (Doc. 20 at 9) As defendant points out, however, the length of claim and the number of lines written is immaterial to whether defendant exercised good faith in refusing to defend.  Rather, the letter makes clear that defendant reviewed the claim and determined whether there was a possibility of coverage.  Applying particular policy provisions, it concluded that there was no coverage.

For these reasons, there was no breach of the duty to defend.

Plaintiff argues that defendant breached its duty of good faith by considering matters outside the pleadings when making its decision to deny a defense.

Under Ohio law,

> '[A]n insurer has the duty to act in good faith in the handling and payment of the claims of its insured. A breach of this duty will give rise to a cause of action against the insurer.' *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 276 (1983).  However, 'whenever an insurance company denies a claim of its insured, it will not automatically expose itself to an action in tort.' *Id.* at 276-77. Additionally, mere negligence on the part of the insurer in determining to deny a claim is not enough to establish that it acted in bad faith. *See Hart v. Republic Mut. Ins. Co.*, 152 Ohio St. 185, 187-88 (1949).
>
> The standard to be applied in determining a claim of bad faith is that of 'reasonable justification.' *Zoppo v. Homestead Ins*. Co., 71 Ohio St.3d 552, 554 (1994) (citing *Hart, supra*, 152 Ohio St. at 185). When an insurer asserts that its decision to deny a claim is warranted, this decision 'may not be arbitrary or capricious.' *Hart*, 152 Ohio St. at 188. '[A]n insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor.' *Staff Builders, Inc. v. Armstrong*, 37 Ohio St.3d 298, 303 (1988).

*Klein v. State Farm Fire & Cas*., 250 Fed.Appx. 150 (6th Cir. 2007).

Plaintiff contends that while the declination letter states that Carlyle was not an approved product of Legacy and that plaintiff was "selling away" products and marketing products that were not registered securities, the arbitration claim does not make these specific allegations and, therefore, Ms. Goodyear resorted to facts outside the four corners of the claim in making her determination.   Again, the arbitration claim contained allegations of only one investment- Carlyle.  There were no other allegations of other investments within the scope of the policy's definition of professional services.  Defendant knew the claim did not involve an approved security.  Plaintiff's contention that defendant's knowledge in this respect shows that it went beyond the pleadings puts an unreasonable spin on what is required in reviewing a claim.

Plaintiff next points to the deposition testimony of Ms. Goodyear's supervisor, Atea Martin, who testified that the essence of the arbitration claim was about investment in Carlyle and "we knew" after the state court case that Santalucia was not complaining about any mutual funds or securities that were approved by legacy.  She also testified that it was appropriate to deny coverage based on what was found out after the state court case. (Martin depo. 47-48) Plaintiff asserts that this testimony shows that defendant went outside the pleadings to make a decision to decline defense.

The Court finds that the testimony does not evidence bad faith.  Ms. Martin wrote a letter, dated February 9, 2007, to plaintiff's counsel in response to a further written request by plaintiff's counsel to get defendant to defend and indemnify.  Ms. Martin stated in the letter that defendant "stands by its coverage declination with respect" to plaintiff and she again outlined the reasons given previously for its decision to deny coverage.  Ms. Martin then

17

explained that while the state court case made "sweeping allegations relating to general investment advice and purchasing of stocks and mutual funds," the arbitration claim contained no such sweeping allegations. At her deposition Martin was asked, "Had those type of allegations [made in the state court case] been set forth in the statement of the claim for the arbitration proceeding, would you have advised [defendant] to defend [plaintiff]?" She answered, "Probably not." When asked why, she gave the answer that plaintiff references directly above. As defendant points out, Martin was responding to a hypothetical question and was not testifying as to what defendant actually did.

For these reasons, plaintiff fails to demonstrate that defendant acted in bad faith.

Finally, plaintiff asserts that defendant failed to seek summary judgment as to Count IV wherein he alleged that defendant mischaracterized the claim asserted against the Legacy thereby causing plaintiff to pay a higher deductible or self-retention for the defense of the claim against Legacy. Defendant did not specifically address this count in its motion although it sought summary judgment as to the Complaint "in its entirety." (Doc. 16 at 20) Defendant does address this count in its reply brief.

Summary judgment is proper on this claim as well. As defendant points out, this claim involves the "selling away coverage" endorsement to the policy which provides that "with respect to any claim involving products not approved by [Legacy], the Insured shall be responsible for 20% of the Loss, excess of a $100,000 deductible..." As demonstrated above, the arbitration claim involved allegations relating only to the claimant's investment in Carlyle, which was not an approved product. As such, no bad faith has been demonstrated by defendant's application of the deductible to Legacy.

18

**Conclusion**

For the foregoing reasons, defendant's Motion for Summary Judgment is granted.

IT IS SO ORDERED.

                                               /s/ Patricia A. Gaughan
                                               PATRICIA A. GAUGHAN
                                               United States District Judge

Dated: 6/9/08